201 F.Supp.2d 995 (2001)
Patricia OSTMANN, Plaintiff,
v.
Larry MASSANARI,[1] Acting Commissioner of Social Security, Defendant.
No. 2:00-CV-55 (MLM).
United States District Court, E.D. Missouri, Northern Division.
September 28, 2001.
*996 *997 Donald L. Kohl, Shea & Kohl, St. Charles, MO, for Plaintiff.
Maria C. Sanchez, Audrey G. Fleissig, U.S. Attorney, Office of U.S. Attorney, St. Louis, MO, for Defendant.

MEMORANDUM AND ORDER
MEDLER, United States Magistrate Judge.
This is an action under Title 42 U.S.C. § 405(g) for judicial review of defendant Larry Massanari's ("Defendant") final decision denying plaintiff's ("Plaintiff") application for Social Security benefits under Title II of the Social Security Act. Plaintiff has filed a brief in support of her Complaint. [11] Defendant has filed a brief in support of his answer. [12] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [13]

I.

PROCEDURAL HISTORY
Plaintiff filed an application for disability insurance benefits on September 27, 1990, alleging a disability beginning in December 1989 due to back problems and ulcers. The application eventually received review by Administrative Law Judge ("ALJ") Francis P. Dorsey, who issued his decision on August 9, 1991, concerning Plaintiff's applications for disability insurance benefits. He concluded that Plaintiff was not disabled as defined by the Social Security Act and was not entitled to disability insurance benefits. (Tr. 239-246). The Appeals Council denied review of Judge Dorsey's opinion. (Tr. 251-252). Petitioner then appealed the decision to the United States District Court for the Eastern District of Missouri, Northern Division. The Commissioner filed a motion to remand the case because the claim file could not be located and needed to be reconstructed. (Tr. 253-254). The claim file was reconstructed and the Commissioner then moved to reopen the case pending in federal court on July 26, 1994. (Tr. 255).
On December 6, 1995, United States Magistrate Judge Frederick R. Buckles, *998 before whom Plaintiff's case was pending, issued a Memorandum and Order in which he affirmed the decision of the Commissioner denying Plaintiff's claims for benefits (Tr. 256-282).
On February 16, 1996, Plaintiff filed another application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 1381, et seq. (Tr. 72-74), alleging a disability beginning December 18, 1989, by reason of lower back problems, major back surgery and arthritis in the back. (Tr. 72, 89). The application was denied initially (Tr. 67-71) and upon reconsideration. (Tr. 60-64).
Plaintiff received a hearing before ALJ Myron Mills. On October 18, 1996, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 290-296). Plaintiff then asked the Appeals Council to review the decision of the ALJ. Upon consideration, the Appeals Council vacated the hearing decision and remanded the case to an ALJ for resolution of the following issue: "The hearing tape cannot be located. The record is therefore incomplete." (Tr. 283-84).
Additional evidence was submitted and another hearing was held on August 11, 1998, before ALJ Phyllis L. Weber. (Tr. 26-56). The ALJ determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 12-21).
After considering a letter from Plaintiff's attorney (Tr. 3), the Appeals Council denied review of the ALJ's determination. (Tr. 4-5). Thus, the decision of the ALJ stands as the final determination of the Commissioner.

II.

TESTIMONY BEFORE THE ALJ
Plaintiff testified before the ALJ on August 11, 1998. Plaintiff testified that she suffers from degenerative disc disease which required back surgery in 1993. She stated that she continues to have pain with some radiation principally to the left leg. She also claims to suffer from degenerative arthritis. (Tr. 29). Plaintiff acknowledged that, although the hearing was being held in 1998, her last insured date was December 31, 1995. Thus, her current condition was not relevant. Instead, her condition prior to January 1, 1996 was relevant. (Tr. 30).
Plaintiff testified that she had completed the tenth grade. She stated that she could read and write. She has no military service. (Tr. 33).
Plaintiff has been married for seven years. (Tr. 33). Plaintiff lives in a house with her husband and two sons, ages twenty-three and eighteen. (Tr. 30). Both of her sons are employed. Plaintiff's husband is also employed in a mechanics business he and Plaintiff own. However, Plaintiff does not do any work for the company. (Tr. 32).
Plaintiff reported quitting work in 1989 as a factory worker for General Corporation Automotive. She receives long-term disability through this company in the amount of $634.40 a month. (Tr. 31, 34). She stopped working due to back pain. (Tr. 33). She stated that she saw an orthopedic doctor who treated her for a while until he eventually told Plaintiff to stop working. (Tr. 33).
Plaintiff underwent surgery in 1993. The surgery was called "BAK replacement" which required the removal of two discs from her back. Part of her hip bone was removed and placed inside metal bolts. These metal bolts were then screwed between Plaintiff's vertebrae. (Tr. 33). Plaintiff's surgeon believed that the surgery was successful. However, it did not alleviate the problems Plaintiff had with the arthritis in her back. (Tr. 40). Following *999 surgery, she went to rehabilitation for a while. This lasted for three months. Then she received an exercise program to do at home because she lived so far away from rehabilitation center. She stated she did the exercises for a while but they were bothering her so badly that the physical therapists told her to stop doing the exercises and just walk. (Tr. 46).
At the time of the hearing, Plaintiff reported that she sees her family doctor, Dr. Crump, approximately once every three months for a myriad of reasons, including her back pain. She said she does not visit the doctor more often because of the expense. (Tr. 35).
Plaintiff testified that her present problems include a lot of pain. (Tr. 35). Plaintiff reported that her lower back hurts and the pain goes into her hips and down her left leg. (Tr. 37). She stated that Dr. Highland, the doctor who performed her surgery, told her that she had arthritis in her back. She said she also saw an arthritis doctor, Dr. Kay, who confirmed this diagnosis. (Tr. 36).
Plaintiff indicated that she has pain 95% of the time. (Tr. 37). She reported that when her pain is at its worst, she would rate it a "nine," on a scale of one to ten, with ten being so painful you need to go to the hospital. Normally, her pain is at least a seven. (Tr. 41). She states that the pain feels like a knife sticking her in her back. (Tr. 41). She also stated that when she coughs or sneezes, she feels pain in her back. (Tr. 41). The pain worsens in rainy weather and in cold weather. It also worsens if she "sleep[s] wrong the night before." She uses a heating pad to alleviate the pain. She also takes "super hot" showers and lets the massaging water hit her back. (Tr. 37). On a bad day she takes three showers a day. (Tr. 44). During a one-month period, she takes showers on 22-25 of those days. (Tr. 44). Plaintiff testified that she needs to rest at least three times a day. She lays on a heating pad for about an hour at a time. (Tr. 45).
Plaintiff stated that she takes extra-strength Tylenol, four at a time. She takes them three to four times a day, for a total of twelve to sixteen tablets a day. (Tr. 38). Plaintiff also takes Eccotrim, which is an over-the-counter medication intended to relieve some of the inflamation of the arthritis in her spine. She takes nine Eccotrim pills a day. (Tr. 38).
Plaintiff stated that she also suffers from ulcers which she has had for about eight years. (Tr. 43). She takes Maalox for her ulcers once a day. (Tr. 44). She does not suffer any adverse effects from the ulcers. She needs only to watch her spicy foods and take pain medication that does not have aspirin that dissolves in her stomach. (Tr. 44).
Plaintiff testified that her doctor wants her to try to walk as much as she can. However, she does not walk very much. (Tr. 39). She will walk to her mechanic's shop, which is behind her house about fifty yards away. Other than that, she watches television. She does light house work, washes small loads of laundry, and cooks small meals. She cannot lift heavy casserole dishes. (Tr. 39). Her husband and sons do most of the work. (Tr. 45).
Plaintiff testified that she can stand for up to thirty minutes. (Tr. 42). She can lift seven-and-a-half to ten pounds. (Tr. 42). She visits family or friends once every two weeks. (Tr. 43). She does not attend church and she has no social or club activities. (Tr. 43). Her husband shaves her legs for her because she cannot bend over. She uses a hand-held device to put her socks on. (Tr. 44). She has a "grabber" that she uses to pick things up off the floor. (Tr. 44-45).
*1000 Plaintiff stated that her back is worse now than compared to 1991, when she was denied benefits. (Tr. 39). Her back condition has worsened since her surgery, as well. (Tr. 40). Plaintiff stated that she does not do as much grocery shopping now as she did at the time of her prior hearing in 1996. (Tr. 40).
Plaintiff's husband, Brian Ostmann, also testified before the ALJ at the hearing. The ALJ focused Mr. Ostmann's testimony during the time period following Plaintiff's back surgery in 1993 until her insured status expired at the end of 1995. Mr. Ostmann testified that even before her surgery, Plaintiff had difficulty doing anything. They used to go camping but had to stop that in 1991 or 1992. She also had to stop bass fishing, off-roading and four-wheel truck driving. She cannot work in the garden. She cannot mow the lawn. (Tr. 48).
Dr. Smith, a vocational expert, testified before the ALJ at the hearing. Dr. Smith classified Plaintiff's past work experience in a shoe factory as unskilled. Her work as a production supervisor was light and skilled. Her automotive assembly work in terms of car parts was medium and unskilled, although Plaintiff described this work as being light. Plaintiff's waitress work in a bar was classified as light and semi-skilled. (Tr. 52).
The ALJ posed the following hypothetical question to the vocational expert:
[T]his hypothetical individual is 37, has a 10th-grade education, no problems with reading and writing, has work experience comparable to that of the Claimant. I'm going to give you a residual functional capacity for sedentary work with a sit-stand option. And there would be limitations because of back problems.... Limited bending, stooping and kneeling, and limited in climbing. And not a position that would involve heavy vibration, and that the pain that this individual would have would be mild to moderate in nature. Are there any jobs for such an individual?
(Tr. 52-53).
The vocational expert answered this hypothetical question in the affirmative. He stated that several occupations were available to Plaintiff, including the jobs of telemarketer, telephone solicitor, different types of cashiering positions and production inspector. (Tr. 53). In combination, Dr. Smith said that about 15,000 of these jobs existed within the St. Louis area. There would be about twice that many within the State of Missouri. (Tr. 53)
The ALJ then asked the vocational expert following question:
Now if I do not find it credible that this individual lies down for three times during the waking hours, that would be from 8 to 11, that this individual does not have to lie down three hours, would that affect the jobs, or  that would have no effect upon the jobs, is that correct?
(Tr. 53). Dr. Smith said that was correct. (Tr. 54). However, Dr. Smith stated that if the ALJ were to find that the person was credible, in that from 8:00 in the morning until 11:00 in the evening she had to lie down three times for one hour at a time, then he knows of no competitive work that could be done under those circumstances. (Tr. 54). Dr. Smith also testified that if you add to the hypothetical the need for Plaintiff on the majority of the days to rest the back or to take a hot shower three times a day, this would also prevent any gainful employment. (Tr. 54).

III.

MEDICAL AND OTHER RECORDS BEFORE THE ALJ
In January 1990, Plaintiff was admitted to the Metropolitan Medical Center for a *1001 lumbar myelogram, and electromyogram/nerve conduction studies and a CT post-myelogram. She was diagnosed with a protruding nucleus pulposus at L5-S1 and lumbar sacral sprain. (Tr. 155-158). Plaintiff was admitted to the Metropolitan Medical Center on March 27, 1990, for the operative procedure of manipulation and injection of the lower back. (Tr. 153-54).
An MRI of Plaintiff's lumbar spine on February 21, 1991, showed central mild bulge at L5-S1 disc associated with changes of desiccation of the L5-S1 disc. The remainder of the examination was normal. (Tr. 52).
Plaintiff had lumbar epidural steroid injections on March 26, 1991 and May 30, 1991. (Tr. 148-51).
Plaintiff was admitted to the Barnes St. Peters Hospital in St. Peters, Missouri on November 8, 1991, with a long history of back and left leg pain. The doctor noted that Plaintiff had gone through epidural steroid injections, physical therapy, medication and the like but had not been back to work and still had debilitating back and leg pain. She was admitted at this time for discography with anesthesia and for a post-discographic CT scan. (Tr. 144-147).
Plaintiff was a patient of Michael H. Winer, M.D., from April 1992 through August 1992. When the doctor first saw her in April, he noted, after physical examination, that her disability appeared greater than what was seen on any of her x-ray studies. Thus, the doctor had Plaintiff undergo a series of tests, including a lumbar CT scan on July 20, 1992, which showed mild circumferential bulging disc at L3-4 and L5/S1 along with facet osteoarthritis on the left at L4-5. There was no evidence of focal disc protrusion or herniation. In August 1992, the doctor noted that Plaintiff had some facet arthritic change and degenerative bulging of the discs. However, her pain response was out of proportion to the finding. The doctor encouraged Plaintiff to increase her level of endurance activity. (Tr. 142, 194-196).
On November 20, 1992, Plaintiff underwent an MRI of the lumbar spine. The study revealed her lumbar vertebral bodies to be in good alignment. A small bulging disc was noted at the L5-S1 level. No definite herniated disc was noted. The remainder of the lumbar discs were satisfactory in appearance. There was mild loss of signal intensity on the T2 weighted images in the L5-S1 disc consistent with early degenerative disc disease. The spinal canal was adequate. (Tr. 140).
On January 21, 1993, David D. Scherer, M.D., examined Plaintiff upon referral to determine whether Plaintiff could return to work at her "current occupation or any type of occupation with limitations." After examining Plaintiff and reviewing the various imaging studies she brought with her to the examination, the doctor offered the following:
Ms. Ostmann has had numerous appropriate diagnostic studies over the last three years or so to try to implicate her lumbar spinal region as the cause of her complaints of lumbar and bilateral lower extremity pain, without any convincing evidence for an etiology being found. She has had appropriate treatment for all the known physical problems in the lumbar region or elsewhere which could cause those symptoms. She has never been found to have a neurologic deficit until my examination today, although she told me that only one physician has ever tested sensation in her lower extremities prior to my examination, and my findings today were those of essentially uniform hypesthesia in her left thigh and calf most typical of hysteria. My review of the imaging studies described above did not reveal convincing *1002 evidence even of degenerative disc disease as severe as I would expect in an asymptomatic person of her age. The "instability" test which I performed was incompatible with a disorder of the discs or facet joints, helping to rule out ruptured disc, osteoarthritis, and degenerative disc disease (which is the early state of osteoarthritis).
I believe that Ms. Ostmann's symptoms are psychogenic in origin because of the above findings. A psychiatric or psychologic evaluation should support this view. With regard to her disability, I believe that she may be disabled for activities more vigorous than those which she performs around home (described above) and that continued attempts to treat her for physical abnormalities will be as fruitless as those appropriate measures which have been tried over the last several years. I do not know whether psychiatric measures can restore her ability to face life comfortably.
(Tr. 318-321).
On May 28, 1993, Plaintiff saw Thomas R. Highland of the Columbia Orthopaedic Group in Columbia, Missouri. She complained of pain in her back, numbness and pain radiating down her legs, of long-standing duration. The doctor reported.
She was initially treated by Dr. Wood in St. Peters and he moved and she continued to be treated by other orthopaedic surgeons in St. Peters. She has had therapy including a mild exercise program, a TENS unit which she has at home. She has tried arthritis medicine. She has had epidural steroids which haven't really helped her. She has had a discogram, EMG's and evaluations. She states that if she stands and puts pressure on her left leg it increases her pain. Bending, twisting, lifting even up to five pounds, sitting on a hard surface, all increase her pain in her back. She states it continues to slowly get worse. She has been told there is nothing that can be done.
(Tr. 188). Examination revealed mild tenderness. She had diminished range of motion in her back. She moved around slowly. She was hesitant to put weight on her left leg. Straight leg raising on the left caused low back pain, as did straight leg raising on the right, but mildly so. Reflexes and strength were normal. Review of an MRI from 1992 showed degenerative disc at L5-S1. She had a discogram at L4-5 and L5-S1 and there was some early degeneration of L4-L5 on the discogram. The doctor believed she had symptomatic degenerative disc disease at L5-S1. (Tr. 187-188).
Dr. Highland completed an "Attending Physician's Statement of Disability" on June 21, 1993. In that form, he noted that Plaintiff suffered from low back pain with some degeneration. He noted that Plaintiff had a "Class 5" physical impairment, which is defined as "Severe limitation of functional capacity, incapable of minimal (sedentary) activity. (75-100%)." He noted no mental or nervous impairments. He noted she was totally disabled from both her job and any other work. (Tr. 185-86).
On July 21, 1993, Plaintiff was admitted to Columbia Regional Hospital where she underwent the operative procedure of a lumbar discogram at L2-3, L3-4, L4-5 and L5-S1. (Tr. 137-38).
On October 19, 1993, Plaintiff was admitted to the Columbia Regional Hospital symptomatic of degenerative disc disease. She complained of pain in the back with episodes of numbness and pain radiating down the legs. Physical examination revealed some mild tenderness along the lumbar spine into the region of L4-5 and L5-S1 and across the top of the iliac crest. She had diminished range of motion, particularly *1003 in flexion and extension of the lumbar spine. She could heel and toe walk. Rhomberg was negative. Straight leg raising caused some pain in the lower back bilaterally, more on the left than the right. Deep tendon reflexes, strength and sensation were intact. (Tr. 122). Plaintiff was taken to the operating room whereupon, under general anesthesia, an anterior lumbar discectomy infusion L4-5 and L5-S1 using BAK implants and left iliac crest bone graft were performed by Dr. Highland. X-ray confirmed good position. Plaintiff remained hospitalized for one week, whereupon she was discharged with directions to avoid lifting, twisting or bending over. She was instructed to wear a lumbosacral corset when walking or when sitting for meals. Her condition was good at the time of discharge. (Tr. 122-35).
On December 2, 1993, Dr. Highland saw Plaintiff. He noted that she was doing much better, six weeks post-op. She was walking and her pain was diminishing. She reported having a little numbness in the right anterior thigh but no pain. Her x-rays looked "great." (Tr. 184).
Dr. Highland noted on January 10, 1994, that Plaintiff was still complaining of pain in her back and numbness in her right thigh. However, she was walking and getting along fairly well and her x-rays looked good. (Tr. 183).
Dr. Highland noted on March 3, 1994, that Plaintiff was still complaining about back pain and numbness in her right thigh. By May 4, 1994, the doctor noted that Plaintiff was feeling better. He noted that although she still had some numbness down her right thigh, she was not in a lot of pain. She told the doctor that she was better than she was before surgery. (Tr. 183).
On August 1, 1994, Plaintiff returned to Dr. Highland complaining of some soreness in her back. He noted that Plaintiff had been more active bending and doing things in the garden. Additionally, her legs were not giving way, all of which was good. The x-rays looked good. The doctor told her to continue to do what she could and return in a year. (Tr. 182).
On October 17, 1994, Plaintiff returned to Dr. Highland, now a year out from her surgery. Not much had changed and the doctor noted that surgery did not really help her in a large amount. The x-rays looked good. (Tr. 182).
On April 24, 1995, Plaintiff returned to Dr. Highland. Although she continued to have increasing complaints of her back, the doctor found the x-rays to look really good and could not figure out what was causing her pain. He recommended a myelogram and CT scan. (Tr. 182).
On May 8, 1995, Plaintiff was seen at Columbia Regional Hospital for lumbar myelogram. The myelogram showed: (1) status posterior anterior stabilization; unchanged alignment from previous exams of October 1993; (2) minimal ventral and dorsal extradural impingement at L3-4; changes were minimal and non-lateralizing; and (3) negative for nerve root sheath amputation or other effect on the thecal sac. (Tr. 119-120). A post lumbar myelogram CT scan revealed: (1) status post anterior stabilization at L4-5 and L5-S1 with BAK device; normal associated beam hardening artifact from the device; (2) mild inhomogeneity to the epidural space at L5-S1 and in the orifice of the left neural foramen felt to be very mild epidural fibrosis; the neural foramen was widely patent and no edema was noted at the descending nerve root; and (3) minimal annular bulging at the upper levels which barely effaced the anterior thecal sac; no focal disc protrusions were seen at this or any levels. (Tr. 117-118).
*1004 On June 22, 1995, Plaintiff saw Dr. Highland who noted that Plaintiff had tried "some anti-inflammatories smorgasbord that we gave her. The Relafen, Kaypro and Oruvail; they all bother her stomach and didn't really seem to help her pain." The doctor recommended that Plaintiff consider a rheumatology consult. (Tr. 181).
On August 30, 1995, Plaintiff saw her family physician, Dr. Crump, complaining of pain in her right side. She told the doctor that she had been having pain since she cleaned the freezer and moved furniture a week earlier. (Tr. 174).
In October 1995, Donald R. Kay, M.D., saw Plaintiff upon referral from Dr. Highland. The doctor noted that Plaintiff reported problems walking, climbing stairs, getting upon from a chair and sleeping. She stated she was still doing her housework and her shopping and looking after the family. Examination revealed a "chubby" lady with a relatively normal gait. Neurologic exam was 2+ symmetrical reflexes, intact sensation, negative straight leg raises and no focal motor weakness. Peripheral joint exam was totally normal except for the left hip, which did not want to extend completely and was slightly irritable. The lumbar spine had limited motion and slight paraspinous muscle spasm. The doctor's clinical impression was post-operative chronic low back pain, perhaps related to mild neural fibrosis and moderate facet disease and posture. The doctor found her treatment to be problematic as she was going to have some persistent pain. He stated she should be doing abdominal strengthening exercises and was encouraged to keep up her walking regimen. (Tr. 190).
On November 17, 1995, Plaintiff was seen by R. Ray Cunningham, M.D., for her 24-month BAK follow-up. She reported at that time that she was having back pain on a daily basis. However, her x-rays showed excellent placement of her BAK device. There was evidence of bone graft forming around the hub at both levels on the right at L4-5 and on the left at L5-S1. Her physical examination remained unchanged. She had back pain with straight leg raising on the left but no leg pain and no back pain with straight leg raising on the right. Her reflexes were at 2+ and equal. Her motor strength was 5/5 bilaterally throughout. (Tr. 179).
On December 1, 1995, Dr. Highland completed a "Supplementary Claim Disability Benefits" form. In that form he noted that Plaintiff's present condition was degenerative disc disease in the lumbar region. He noted that Plaintiff's standing, climbing, bending, sitting and lifting were limited only by her complaints of pain. He indicated that Plaintiff had a "Class 4" physical impairment, which is defined as "Moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity (60-70%)." He also noted that Plaintiff had no limitations in her ability to function under stress and engage in interpersonal relations. Although the doctor believed Plaintiff was disabled from her regular occupation, he did not believe her to be disabled from any occupations. (Tr. 177-178).
On April 15, 1996, Plaintiff underwent a functional capacity evaluation at Healthsouth Rehabilitation Center. Plaintiff was referred to Healthsouth for determination of physical/functional capabilities with regard to her usual and customary job as a factory worker and for determination of her potential to return safely to that job situation. Submaximal aerobic capacity testing revealed Plaintiff to be in the "poor" category with regards to age and sex. Musculoskeletal screening showed that Plaintiff's lower extremity flexibility was severely limited and her active range *1005 of motion was severely limited in all planes. Her lower extremity strength was inconsistent. She had a normal gait. A profile of somatic and psychosocial indications indicated Plaintiff was in the severe range for "pain magnification behaviors." In functional testing, Plaintiff fell within normal range. She demonstrated restrictions with regard to the non-material handling positions. It was noted that Plaintiff may benefit from flexibility strengthening and aerobic conditioning to increase flexibility strength and cardiovascular status. (Tr. 160-170).
Plaintiff was seen by Dr. Jeffrey Crump on July 31, 1997, complaining of back pain. The doctor noted that she suffered from chronic pain syndrome in the lumbar spine. (Tr. 304).
In or about March 1998, Plaintiff's physician, Dr. Crump, completed a "Supplementary Claim Disability Benefits" form. On that form, he indicated that Plaintiff was limited in standing, climbing, bending, sitting, walking, stooping, lifting and psychologically. He found Plaintiff to have a Class 5 physical impairment, which is defined as "Severe limitations of functional capacity; incapable of minimal (Sedentary) activity (75-100%)." He stated that Plaintiff was not a suitable candidate for further rehabilitation services and that her present job could not be modified to allow for impairment. He did not believe Plaintiff could return to work. He reported that Plaintiff suffered from chronic pain with marked limitations which prevented gainful employment. (Tr. 301-302).

IV.

DETERMINATION OF THE ALJ
The ALJ initiated her opinion with the following:
Disability is alleged beginning December 18, 1989 due to back pain. However, there was a previous hearing decision finding that the claimant was not disabled on or before August 9, 1991. This decision was upheld by the United States District Court for the Easter[n] District of Missouri on December 6, 1995. The current application is based on the same facts and same issues as previously determined in the prior hearing decision. Thus, based on the doctrine res judicata the issue of disability on or before August 9, 1991 has already been determined. The undersigned will therefore determine the claimant's disability status since August 10, 1991.
(Tr. 13).
After considering the evidence of record, the ALJ concluded that Plaintiff was not under a "disability," as that term is defined in the Social Security Act, at any time from August 10, 1991 (the date of her last application), through December 31, 1995 (the date upon which her insured status requirements expired). (Tr. 20). She found that Plaintiff met the disability insured status requirements of the Social Security Act from August 10, 1991 through December 31, 1995. (Tr. 19). Judge Weber noted that Plaintiff had not engaged in substantial gainful activity during this time frame. (Tr. 19).
The ALJ assessed the medical records and set forth Plaintiff's medical history. (Tr. 20-21). She determined that the medical evidence established that Plaintiff had discogenic and degenerative disorders of the back. However, while these impairments were severe, they did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 19).
The ALJ next determined Plaintiff's residual functional capacity. The medical evidence and Plaintiff's subjective complaints were considered in determining Plaintiff's residual functional capacity.
*1006 The ALJ found that Plaintiff's testimony, insofar as it related to disabling and debilitating subjective complaints, was not credible and therefore not entitled to significant weight and consideration. Considering Plaintiff's allegations pursuant to Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir.1984), the ALJ listed the following factors which detracted from Plaintiff's credibility: (1) the objective medical evidence does not support Plaintiff's complaints; (2) Plaintiff's use of only over-the-counter pain relievers and mild palliative heat is inconsistent with Plaintiff's claims of severe levels of pain; (3) Plaintiff's claim that she must lie down three times per day is not reflected in her doctor's record as a medical necessity and, in fact, she has been urged by her doctor to be more active; (4) the record contains several examples of symptom magnification; and (5) despite testimony by both Plaintiff and her husband of physical limitations and correspondingly limited activities, the record indicates greater levels of activity. Considering all relevant factors, the ALJ found that Plaintiff had functional limitations as well as pain, but that her statements concerning her impairments and their impact on the ability to work were generally not credible and were not given significant weight. The ALJ noted that an individual does not have to be pain free to engage in work activity. (Tr. 16-18).
Based on all the factors, the ALJ found that during the period at issue in the decision, Plaintiff retained the following residual functional capacity: She could lift a maximum of ten pounds and must alternate sitting and standing to relieve pain or discomfort. This is a range of sedentary work. The ALJ concluded that Plaintiff's impairment prevented her from performing her past relevant work. (Tr. 24).
As Plaintiff lacked the residual functional capacity to perform her former employment, the ALJ shifted the burden to the Social Security Administration to show that there are other jobs existing in significant numbers to which Plaintiff would be able to make a successful vocational adjustment considering her age, education, work experience and residual functional capacity. (Tr. 18). Relying upon the testimony of a vocational expert in response to a hypothetical question including all of Plaintiff's limitations, the vocational expert testified that such jobs existed.
The ALJ found that Plaintiff was able to make the adjustment to other work. Thus, the ALJ concluded, Plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act. In addition, Plaintiff was not eligible for supplemental security income under section 1614(a)(3)(A) of the Social Security Act. (Tr. 25).

V.

LEGAL STANDARDS
Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. First, the claimant cannot be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairment which significantly limits [claimant's] physical or mental ability to do basic work activities...." Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, then the claimant is per se *1007 disabled. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(f), 416.1520(f). If claimant meets these standards, the ALJ will find the claimant to be disabled.
The ALJ's decision is conclusive upon this Court if it is supported by "substantial evidence." Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992); Cline v. Sullivan, 939 F.2d 560, 564 (8th Cir.1991). It is not the job of the Court to reweigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir.1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir.1992). Instead, the Court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Naber v. Shalala, 22 F.3d 186, 188 (8th Cir.1994); Onstead, 962 F.2d at 804. Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).
Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir.1984). In Bland v. Bowen, 861 F.2d 533 (8th Cir.1988), the Eighth Circuit Court of Appeals held:
[t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.
Id. at 535. See also Metcalf v. Heckler, 800 F.2d 793, 794 (8th Cir.1986); Clark v. Heckler, 733 F.2d at 68. Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion. Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir.1991); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir.1989).
To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:
(1) The findings of credibility made by the ALJ;
(2) The education, background, work history, and age of the claimant;
(3) The medical evidence given by the claimant's treating physicians;
(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
(5) The corroboration by third parties of the claimant's physical impairment;
(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
(7) The testimony of consulting physicians.
Brand v. Secretary of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir.1980); Cruse v. Bowen, 867 F.2d at 1185.
The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be *1008 expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment, Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir.1993); Roach v. Sullivan, 758 F.Supp. 1301, 1306 (E.D.Mo.1991).
"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). When evaluating evidence of pain, the ALJ must consider:
(1) the claimant's daily activities;
(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
(3) any precipitating or aggravating factors;
(4) the dosage, effectiveness and side effects of any medication; and
(5) the claimant's functional restrictions.
Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir.1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors as well as the plaintiff's appearance and demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse v. Bowen, 867 F.2d 1183 (8th Cir.1989).
The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir.1992); Ricketts v. Secretary of Health & Human Services, 902 F.2d 661, 664 (8th Cir.1990); Jeffery v. Secretary of Health & Human Services, 849 F.2d 1129, 1132 (8th Cir.1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Id.; Butler v. Secretary of Health & Human Services, 850 F.2d 425, 426 (8th Cir.1988). Although credibility determinations are in the first instance for the ALJ and not the court, the ALJ's credibility assessment must be based upon substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir.1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir.1985).
When a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987).
Where the ALJ holds that the plaintiff cannot return to his past relevant work, the burden shifts to the Commissioner to show other work that the plaintiff could perform in the national economy. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir.1983). This is a two-part burden. First, the Commissioner must prove that the plaintiff has the residual functional capacity to perform other kinds of work. Residual functional capacity is defined as what claimant can do despite his limitations (20 C.F.R. § 404.1545(a) (1983)), and includes an assessment of physical abilities and mental and other impairments. (20 C.F.R. § 404.1545(b), (c), (d) (1983)). The Commissioner has to prove this by substantial *1009 evidence. Warner, 722 F.2d at 431. Second, once the plaintiff's capabilities are established, the Commissioner has the burden to demonstrate that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Id.
To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 176; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir.1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir.1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir.1989).

VI.

DISCUSSION
The issue before the Court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992). Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.1992). Thus, even if there is substantial evidence which would support a decision opposite to that of the Commissioner, the Court must affirm his decision as long as there is substantial evidence in favor of his position. Jones, 86 F.3d at 826.
Plaintiff states that substantial evidence does not support the ALJ's determination. Specifically, Plaintiff claims that the ALJ erred in her hypothetical question to the Vocational Expert; thus, the ALJ did not meet the Commissioner's burden of establishing there was work Plaintiff could perform in the national economy. In addition, Plaintiff claims that the ALJ erred in not giving appropriate weight to the opinions of Plaintiff's treating physicians. Finally, Plaintiff claims that the ALJ erred in evaluating the credibility of the witnesses. Defendant disagrees. Upon reviewing the administrative record as a whole, the undersigned finds that the decision of the ALJ in the instant cause of action is supported by substantial evidence and should therefore be affirmed..

A. HYPOTHETICAL QUESTION
Plaintiff argues first that the ALJ erred in her hypothetical question to the vocational expert. Specifically, Plaintiff contends that the ALJ concluded in her opinion that Plaintiff cannot perform the full range of sedentary work. However, the ALJ's hypothetical posed to the vocational expert did not limit the range of work to less than sedentary. The Court disagrees.
In the ALJ's hypothetical, the ALJ specifically states that the vocational expert is to consider "a residual functional capacity for sedentary work with a sit-stand option." In addition, the ALJ identified further limitations because of Plaintiff's back problems, including limited bending, stooping, kneeling, and climbing. Furthermore, the ALJ stated in her hypothetical question that it could not be a job "that would involve heavy vibration, and that the pain this individual would have would be mild to moderate in nature." Clearly, the ALJ's hypothetical question limited the *1010 range of work to less than sedentary. Therefore, reliance upon the findings of the vocational expert were correct.
As stated earlier, an ALJ posing a hypothetical question to a vocational expert is not required to include all of a plaintiff's limitations, but only those which she finds credible. Sobania v. Secretary of Health & Human Services, 879 F.2d 441, 445 (8th Cir.1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir.1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir.1985).
Certainly, testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the ALJ's decision. Pratt v. Sullivan, 956 F.2d 830, 836 (8th Cir.1992); Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir.1990). However, where the hypothetical question precisely sets forth all of the plaintiffs physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir.1990); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th Cir.1990).
In this case, the hypothetical question presented by the ALJ reflected Plaintiffs testimony at the hearing and included those restrictions found credible by the ALJ. Miller v. Shalala, 8 F.3d 611, 613 (8th Cir.1993). Because the question was properly formulated, the expert's opinion that jobs existed which Plaintiff could perform, constitutes substantial evidence supporting the ALJ's decision. Wingert, 894 F.2d at 298; Trenary, 898 F.2d at 1365.

B. OPINION OF TREATING PHYSICIAN
Plaintiff contends the ALJ erred in not giving appropriate weight to the reports of Plaintiff's treating physicians, Dr. Wood and Dr. Crump. Dr. Wood found Plaintiff unable to work in 1990. On March 14, 1998, Dr. Crump opined that Plaintiff could not work.
First, the Court agrees with Defendant that the opinion of Dr. Wood carries little weight as it precedes the time frame with which Plaintiff's present application for benefits is concerned. As for the opinion of Dr. Crump, the Court finds the ALJ did not err in the weight she gave to that opinion.
It is true that the opinions and findings of the plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Turpin v. Bowen, 813 F.2d 165, 170-71 (8th Cir.1987); King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989) (these opinions are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); Landsaw v. Secretary of Health & Human Services, 803 F.2d 211, 213 (6th Cir.1986); Houston v. Secretary of Health & Human Services, 736 F.2d 365, 367 (6th Cir.1984). Where diagnoses are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir.1987).
Here, the ALJ considered the opinion of Dr. Crump. The ALJ states "[t]here are several forms from the disability carrier requesting a doctor's opinion on disability. These do not show specific functional limitations *1011 and are not particularly helpful at arriving at an RFC." [17] The Court notes that apart from the shortcomings in the report identified by the ALJ, Dr. Crump's conclusions are not supported by the medical evidence of record. Moreover, even Dr. Crump's own progress notes do not support his conclusions. There is nothing in his progress notes to indicate that Plaintiff is disabled from all work. Therefore, for these reasons, it was entirely appropriate for the ALJ to discount Dr. Crump's opinion of disability.

C. CREDIBILITY OF WITNESSES
For her final argument, Plaintiff argues that the ALJ erred in evaluating the credibility of witnesses. Plaintiff argues:
Judge Weber states there is evidence of symptom magnification (Tr. 16), citing Dr. Lange's report. (Tr. 325). It is interesting to note Dr. Lange saw her after Dr. Wood, and before the surgery was required. His report is contradicted by later medical reports and the surgery. Judge Weber also referenced Dr. Sherr's report of January 21, 1993. Dr. Scherer was hired by Patricia's disability carrier to see if she could work. He found she cannot work, he believed due to psychological problems. (Tr. 321).
See Plaintiff's Brief in Support of Complaint, p. 5.
The Court notes first that Plaintiff's argument is not really a challenge to the credibility of witnesses as neither Dr. Lange nor Dr. Sherr testified at the hearing. Instead, Plaintiff appears to be making an argument similar to his previous argument; that is, that the ALJ gave inappropriate weight to the opinions of these doctors. The Court disagrees.
First, the ALJ's finding that there is evidence of symptom magnification was but a small part of her analysis concerning Plaintiff's subjective complaints of pain. The ALJ found that Plaintiff's testimony concerning her subjective complaints was less than credible because: (1) the objective medical evidence did not support the degree of pain Plaintiff testified she was experiencing; (2) Plaintiff's use of only over-the-counter pain relievers and mild palliative heat was inconsistent with Plaintiff's claims of severe levels of pain; (3) Plaintiff's claim that she must lie down three times per day is not reflected in her doctor's record as a medical necessity and, in fact, she has been urged by her doctors to be more active; (4) the record contains several examples of symptom magnification; and (5) despite testimony by both Plaintiff and her husband of physical limitations and correspondingly limited activities, the record indicates greater levels of activity. Each of these reasons identified by the ALJ support the ALJ's conclusion that Plaintiff's testimony and that of her husband's were less than credible. Moreover, each of these reasons is supported by substantial evidence on the record as a whole. The ALJ's credibility findings must be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Hutsell v. Sullivan, 892 F.2d 747, (8th Cir.1989); Sykes v. Bowen, 854 F.2d 284, 287 (8th Cir.1988). Therefore, the findings of the ALJ must be affirmed.
Second, the Court finds that the ALJ did not improperly rely upon the medical records of these two doctors with respect to the issue of pain magnification. Instead, the ALJ's comment was merely that there is some evidence in the record of symptom magnification. This is an accurate statement by the ALJ.

VII.

CONCLUSION
The Court finds that the Commissioner's decision is supported by substantial evidence *1012 contained in the record as a whole. Thus, the Commissioner's decision should be affirmed.
Accordingly,
IT IS HEREBY ORDERED that the relief sought by Plaintiff in her Brief in Support of Complaint is DENIED. [11]
IT IS FURTHER ORDERED that the relief sought by Defendant in his Brief in Support of Answer is GRANTED. [12]
IT IS FINALLY ORDERED that a separate judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action.
NOTES
[1] On January 20, 2001, President Bush appointed William A. Halter to succeed Kenneth A. Apfel as Commissioner of Social Security. Thereafter, Larry Massanari, was appointed to succeed William Halter. Therefore, the Court has substituted Larry Massanari, Acting Commissioner of Social Security, for Kenneth S. Apfel, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.